The **IRISH SUBCOMMITTEE OF the RHODE ISLAND HERITAGE COMMISSION** and **Robert Whitaker**, its **Chairman; Irish Northern Aid** and **Frank McCabe**, its **President**

v.

The **RHODE ISLAND HERITAGE COMMISSION; Raymond E. Gallison, Jr.; Robert B. Lynch; Hon. Robert K. Pirraglia; M. Rachel Cunha; John Lauth; Mary Brennan** and **Albert Klyberg.**

**Civ. A. No. 85–0751 P.**

United States District Court,
D. Rhode Island.

Sept. 30, 1986.

Stephen J. Fortunato, Jr., Providence, R.I., for plaintiffs.

Thomas Caruolo, Providence, R.I., for defendants.

## OPINION

PETTINE, Senior District Judge.

The plaintiffs brought this action in December 1985 seeking a declaratory judgment invalidating all rules, regulations and guidelines of the Rhode Island Heritage Commission that prohibit the display or distribution of any political paraphernalia, including political buttons, hats, pins and pamphlets at the Rhode Island Heritage Day festivities. The plaintiffs also seek a permanent injunction barring the defendants, their agents, employees, officers and attorneys from restricting the plaintiff Irish Northern Aid's participation in the Heritage Day activities. The plaintiffs base this cause of action on 28 U.S.C. §§ 2201 and 2202 (1982).

The plaintiffs allege that the Rhode Island Heritage Commission has deprived them of their rights of free speech guaranteed by the First and Fourteenth Amendments to the Constitution of the United States; and that the Rhode Island Heritage Commission has denied them equal protection of the law as guaranteed by the Fourteenth Amendment to the Constitution of the United States, in that the defendants have applied the regulation unequally. The plaintiffs claim a cause of action pursuant to 42 U.S.C. § 1983 (1982) to redress these alleged deprivations of their civil rights, and seek recovery of their attorneys' fees as authorized by 42 U.S.C. § 1988 (1982). The plaintiffs ask the Court to take pendent jurisdiction of claims brought under the Rhode Island Constitution; they invoke the jurisdiction granted this Court in 28 U.S.C. § 1343 (1982).

## I. FACTS

The facts in this case are relatively simple and undisputed. The Rhode Island Heritage Commission ("the Commission") is a state commission within the executive branch of the Rhode Island state government. Former Rhode Island Governor J. Joseph Garrahy established the Commission with executive order No. 10, July 1, 1977, and the Commission's existence was codified by statute in 1981. R.I.Gen.Laws § 42–79–1 (1984). The purposes of the Commission include:

(1) Sponsoring and/or coordinating heritage festivals;

(2) Conducting and/or sponsoring heritage seminars, conferences, and symposiums;

(3) Publishing scholarly and popular works relating to the social, political, and cultural development of the state;

(4) Coordinating programs with other private or public groups or agencies which will meet the cultural needs of Rhode Island's citizens;

(5) Observing important events in the state's history with suitable celebrations; and

(6) Funding projects and programs of public or private groups or agencies which relate to the heritage of Rhode Island and its people. R.I.Gen.Laws § 42–79–4 (1984).

Since its creation in 1977, the Heritage Commission has fulfilled this mandate in association with diverse community organizations.[1] The bulk of the Commission's activities is executed through the work of the twenty-three ethnic subcommittees who organize activities relating to their particular ethnic heritage. Generally, the subcommittees petition the Commission's Executive Board for "endorsement"—committee cosponsorship and funding—of social, political, religious and cultural events arranged by outside organizations.[2] A project is "endorsed" and may receive Commission cosponsorship and funding if it receives an approval vote of a majority of the twenty-five commissioners.

The Irish subcommittee of the Rhode Island Heritage Commission derives its existence from the bylaws of the Rhode Island Heritage Commission. The Irish subcommittee is endowed with responsibility for the organization and sponsorship of activities and events commemorating the heritage of Rhode Islanders of Irish descent. In coordinating these events and activities, the Irish subcommittee is authorized to enlist the aid and cooperation of groups and individuals outside the Heritage Commission who are involved in activities relating to the Irish cultural heritage. The plaintiff Irish Northern Aid (NORAID) is a private organization based in Rhode Island and primarily composed of Rhode Islanders. NORAID's principal purpose is to provide relief to the families of individuals affected by the Northern Irish government actions related to the current political strife in that country.

Each year since 1977, the Rhode Island Heritage Commission has sponsored a Rhode Island Heritage Day, an ethnic festival hosted by the twenty-three subcommittees. This event is held for one day each fall on the State House lawn. Each subcommittee is assigned an area of the lawn upon which it may set up booths and tables for the display and sale of ethnic food and artifacts. The booths and tables are arrayed along the lawn's walkways. The walkways lead to the State House steps which are used as a stage area for presentations of ethnic song and dance. The displays in the booth are typically the work of outside organizations who participate in the festival at the invitation of the subcommittees. The Commission has traditionally al-

---

1. Some examples of the Heritage Commission's activities include:

 1) Co-sponsorship of a one-day conference presented by the Anti-Defamation League of B'nai Brith on anti-semitism and racism in the schools: (February 9, 1984).

 2) Sponsorship of an interfaith memorial service for the victims of the Nazi Holocaust; (April 8, 1984).

 3) Endorsement of the Festa di San Giuseppe (April 26—May 4, 1985) sponsored by the Society of St. Joseph.

 4) Endorsement of the Feast of the Madonna Della Civita (July 1985) organized by the St. Mary's Feast Society.

 5) Honoring the seventieth anniversary of the First Genocide of the Twentieth Century through the Armenian Martyrs' Memorial Monument Committee. (April 20, 1985). (Deposition of Raymond E. Gallison, Jr., Exec. Director of the Heritage Commission at 14, 19–21).

2. Some examples of the Commission's sponsorship decisions include funding an ethnic pamphlet series, a grant for Japanese films shown during the Newport Black Ships Festival, a grant for the purchase of a used military vehicle for the Newport artillery, and funding for a Latin American Festival of Music. (Plaintiff's Exhibit 1, appended to Deposition of Raymond E. Gallison, Jr., minutes of Executive Board Meeting, August 8, 1985).

lotted seven booths for Irish subcommittee's use on Heritage Day.

In 1982 and 1983, NORAID occupied a booth on Heritage Day as an official invitee of the Irish subcommittee. Their activities consisted of, among other things, the dissemination of literature regarding the political situation in Northern Ireland and fundraising for their relief efforts. NORAID's participation was not sanctioned by the Heritage Commission, but the 1982 and 1983 Heritage Days passed without incident. In 1984, neither NORAID nor the Irish subcommittee participated in the festivities because of a scheduling conflict.

Since 1977, the Heritage Commission has forbidden groups connected with the ethnic subcommittee booths from displaying or distributing political paraphernalia on Heritage Day. This prohibition is based on a Heritage Day rule (in effect since 1977) which states: "No political paraphernalia— buttons, hats, pins, pamphlets, etc. will be allowed to be displayed or distributed." It is also in the by-laws of the Commission that:

> "The Rhode Island Heritage Commission and its subcommittees are not political organizations. They will not participate in, support, endorse any political candidate or party. No form of political expression will be allowed in the name of the Rhode Island Heritage Commission or its subcommittees."

The Committee has enforced its ban on the distribution of political paraphernalia because it believes that political discourse and the dissemination of political paraphernalia will interfere with one objective of Heritage Day: to promote brotherhood among the various ethnic groups in Rhode Island.

In 1985 the Irish subcommittee intended that NORAID participate in the subcommittee's booths; NORAID intended to distribute its literature from the booth. In an effort to enforce its rule regarding political activity at Heritage Day, the named defendants in their official capacities as the Commission's Executive Committee, advised the Irish subcommittee through the Commission's Executive Director that NO-RAID would not be permitted official participation in Heritage Day 1985. The Executive Committee expressed its belief that NORAID's activities were political and therefore ran afoul of the Commission's rules. The Irish subcommittee declined participation in the festivities of 1985 and instead organized an "informational picket" at the festival. The demonstration lasted approximately twenty minutes before disbanding.

The rule banning all political paraphernalia remains in effect for the 1986 Heritage Day. The plaintiffs seek declaratory judgment invalidating the rule as violative of the First and Fourteenth Amendments to the Constitution of the United States. The plaintiffs claim that the rule violates their constitutionally guaranteed right to speak and that its discriminatory enforcement has violated their right to equal protection of the law. Consequently, the plaintiffs seek the issuance of an injunction barring the defendants from restricting the plaintiffs' participation in Heritage Day 1986. In rebuttal, the defendants argue that the rule is a reasonable time, place and manner restriction on speech in a public forum. Both parties have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## II. DISCUSSION

To succeed on a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, the moving party must establish the absence of any genuine issues of material fact. To determine the existence of any questions of material fact, the Court must view the record in a light most favorable to the party opposing the motion. *John Sanderson & Co. v. Ludlow Jute Co.*, 569 F.2d 696, 698 (1st Cir.1978). If the Court finds that no material facts are disputed, the Court must view the evidence in the light most favorable to the party opposing the motion to determine if the moving party is entitled to judgment as a matter of law. *Fristoe v. Reynolds Metals*, 615 F.2d 1209, 1213 (9th Cir.1980). Taking the above-recited facts as undisput-

ed, I find the plaintiffs entitled to judgment as a matter of law.

### A. Overview of First Amendment Analysis

■ The First Amendment to the Constitution of the United States commands that "Congress shall make no law ... abridging the freedom of speech...." Its prohibition applies to the states through the Fourteenth Amendment to the Constitution of the United States. *See, e.g., Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 749 n. 1, 96 S.Ct. 1817, 1819 n. 1, 48 L.Ed.2d 346 (1976). Analysis of First Amendment questions concerning abridgement of the freedom of speech requires a three-part inquiry. First, the speech must be identified as protected under the First Amendment. Second, the Court must consider the nature of the forum, because the degree to which the state may limit access to the forum depends upon whether the forum is public or nonpublic. Third, the Court must determine whether the state's proffered justifications for the restrictions on the speech satisfy the standards applicable in the particular forum. *Cornelius v. NAACP Legal Defense and Education Fund,* —— U.S. ——, 105 S.Ct. 3439, 3446–47, 87 L.Ed.2d 567 (1985).

### B. Protected Speech

■ This aspect of First Amendment analysis needs little discussion here since it is beyond dispute that political speech deserves stringent Constitutional protection unless it "is directed to inciting or producing imminent unlawful action and is likely to incite or produce such action." *Bradenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). As a general matter, verbal expression is cloaked in First Amendment protection unless it falls into an unprotected category of obscenity, libel or "fighting words"—words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769,

86 L.Ed. 1031 (1942). There is no question that the speech in question here is entitled to First Amendment protection.

### C. Characterization of the Forum

Neither party to this action disputes that the State House lawn is a public forum. The defendants concede that they could not under any circumstances exclude the plaintiffs from the greater lawn surrounding the festival. In defining a forum, however, the Court must focus on the access sought by the speaker. *Cornelius v. NAACP Legal Defense and Education Fund,* —— U.S. ——, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985). The real forum at issue therefore is the Irish Subcommittee booth within the confines of the festival.

■ The Heritage Day festival is a public ethnic festival. It is held on public property and the public is openly invited. It is not a private celebration. The festival is held upon grounds indisputably characterized as a public forum. It is my view that the Heritage Day booths are no less a public forum than the grounds upon which they rest. The state does not change the character of a public forum by prescribing a limited use.

■ A public forum exists in two ways. First, property may be a public forum because its traditional use is inextricably linked with expressive activities. Streets, parks and sidewalks are examples of traditional public forums. In the oft-quoted words of Justice Roberts:

> "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights and liberties of citizens." *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 86 L.Ed. 1423 (1939) (Roberts, J., concurring).

A public forum may also be created when the government opens its property to the public for the exercise of expressive activities. *See Toward a Gayer Bicentennial v. Rhode Island Bicentennial Foundation,* 417 F.Supp. 632, 638 (D.R.I.1976). Once the property has been opened for communicative activities, the authority of the government to limit those activities is sharply curtailed; the government must abide by the near absolute protection afforded speech in the public forum. Any ruling that the Heritage Commission's booths are less than a public forum would destroy the entire concept of a public forum. Just as the government may not restrict access to a previously closed forum once it has been open to the public, the government may not restrict access to a public forum or change the character of that forum by the mere placement of booths upon it.

*North Shore Right to Life v. Manhasset American Legion Post No. 304,* 452 F.Supp. 834 (E.D.N.Y.1978) is directly on point. In *North Shore Right to Life,* an anti-abortion group sought to march in a Memorial Day parade organized by the American Legion on behalf of a Long Island town. The Legion denied the Right to Life group's request to march because their message was political and controversial. *Id.* at 836. The court found that the permit denial violated the Right to Life group's First and Fourteenth Amendment rights which attach to speech in the public forum. The court did not explicitly state that the parade was itself a public forum, although it analyzed the case as a public forum problem. Implicit in the opinion is the view that a parade is as much a public forum as the street upon which it is held. I subscribe to this view and hold that the Heritage Day booths, like the lawn beneath them, are part of the public forum.[3]

3. One court has taken a contrary view of this question. In *Committee for Creative Non-Violence v. Hodel,* 623 F.Supp. 528 (D.D.C.1985) the district court ruled that the National Park Service could exclude the plaintiffs' Christmas statue from display in the Christmas Pageant of Peace on the Washington, D.C. Ellipse. The statue was, in the Park Service's view, too controversial. The statue depicted a homeless man sleeping on a heating grate. The purpose of the statue was to draw attention, at a time of unusual public generosity, to the plight of the homeless. The Park Service permitted the plaintiffs to erect their statue on the Ellipse outside the Pageant display. *Id.* at 529. The district court ruled that the Pageant itself was a nonpublic forum, and thus the Park Service need only supply a reasonable justification for the plaintiffs' exclusion so long as the restriction was viewpoint neutral. *Id.* at 533.

In characterizing the Christmas Pageant of Peace as a nonpublic forum, the district court relied on *Cornelius v. NAACP Legal Defense and Education Fund,* ⸺ U.S. ⸺, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) and *Perry Education Ass'n v. Perry Local Educator's Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) in determining that the government has created a public forum only when it has opened government-owned property for expressive activities. *Community for Creative Non-Violence v. Hodel,* 623 F.Supp. at 533. The district court noted that the Park Service had traditionally selected only a few displays from the many public suggestions they received, and that the Park Service's Pageant was devoted to "traditional" Christmas displays

only. The court concluded on that basis that the Park Service had not intended to create an open public forum for expressive activities. *Id.* I cannot agree with the District of Columbia Court's conclusion because I believe that court's reliance upon *Cornelius* and *Perry* is misplaced. In *Cornelius,* the Supreme Court addressed the question of a national advocacy group's admittance to the Combined Federal Campaign (CFC), a fund raising drive through which charitable organizations may solicit contributions from Federal employees. The Court held that the CFC was not a public forum generally open to expressive activities. The government had never intended to open the fund drive to all charitable groups, thus the government could choose "appropriate" charities so long as the distinctions drawn were viewpoint neutral and reasonable in light of the forum's purpose. *Cornelius v. NAACP,* 105 S.Ct. at 3451. In *Perry,* the Supreme Court upheld a restriction on access to a school system's internal mail network, ruling that the school system had not created a public forum by permitting some outside groups to use the mails. The Court noted that the schools' internal mail was not open for general public use and that the schools had always preconditioned access to the delivery system on its own permission. *Perry,* 460 U.S. at 47, 103 S.Ct. at 956.

It is my view that *Cornelius* and *Perry* are inappropriate authority upon which to rely in analyzing the limitations on speech in a forum created within a public forum. In *Cornelius* and *Perry,* the Court's analysis focused on restricted access to property which was not an

### D. The First Amendment in the Public Forum

■ Once a court has determined that a particular parcel of property is a public forum, it must invalidate any content-based abridgement of the right to speak unless the restriction is supported by a compelling state interest, and the means used are narrowly tailored to that end. *Cornelius v. NAACP Legal Defense and Education Fund, Inc.*, —— U.S. ——, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). In the public forum, the state may also impose reasonable time, place and manner restrictions so long as they are content-neutral, supported by a substantial state interest and narrowly tailored to that end. *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983), *U.S. v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983).

### 1. Content Neutrality

■ The Heritage Commission's rule prohibiting the display of political paraphernalia is clearly a content-based restriction of expression. The Rule prohibits the display of political, but not other types of, paraphernalia. A ban on an entire subject matter is no less a content-based restriction than a ban on expression of a particular viewpoint, and both kinds of restrictions are antithetical to the goals of the First Amendment in the public forum. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). This hostility to content-based regulations extends to prohibitions on public discussion of entire topics for the simple reason that if the government was permitted to select the permissible subject matter of public discussion, the government could "control . . . the search for political truth." *Consolidated Edison Co. v. Public Service Comm'n,* 447 U.S. 530, 538, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980) (invalidating a public service commission regulation which prohibited the discussion of all "political matters" in utility bill inserts).

Directly on point is *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). In that case, a university that had made its facilities generally open to student group meetings refused access to students

---

otherwise open forum. In *Committee for Creative Non-Violence v. Hodel,* the controversy concerned the government's attempts to limit access to otherwise public forum property. As this Court has recognized, the government has greater latitude to limit access to a nonpublic forum than it would to a traditional public forum.

> The public forum doctrine developed, it must be remembered, in response to increasing efforts by government to cut back, restrict, and close off access to forums which were historically, traditionally, and, perhaps, inherently wide open for all types of expression. It would be difficult to argue that the public has a similar historical, traditional, and inherent right of access to [state property] for purposes totally unrelated to that [property's] state function.

*Toward a Gayer Bicentennial v. Rhode Island Bicentennial Foundation,* 417 F.Supp. 632, 639 n. 10 (D.R.I.1976).

The proper inquiry here is not whether the government has created a public or a limited public forum by opening access to government-owned property—the question in *Cornelius* and *Perry*—but whether the government has altered the character of a traditional public forum by limiting access to it. I am not persuaded by the analysis of the District of Columbia Court on this question; I cannot accept its premise which treated the Christmas Pageant as though it was to be held on nonpublic forum property and then examined the access which had been granted. To allow the government to limit traditional public forum property and thereby create within it a nonpublic forum would destroy the entire concept of a public forum. If a court is to focus only upon the limits to access of a subpart of the public forum, the government will be able to create a private forum out of the public forum at will, merely by imposing such limits. I cannot accept that the government may so easily alter the character of public forum property by restricting the use of part of the public forum. It is the restriction itself which must first survive judicial scrutiny. The district court's result not only employed circular logic in defining the forum, but it also runs contrary to decades of First Amendment jurisprudence which has recognized the inalienable nature of First Amendment rights in the public forum. *See, e.g., Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 963, 86 L.Ed. 1423 (1939) (Roberts, J., concurring).

desiring to use school facilities for religious worship and discussion. *Id.* at 264–65, 102 S.Ct. at 271–72. Although the school did not discriminate on the basis of the religious viewpoint expressed, the Supreme Court struck down the restriction as a content-based abridgement of the right to speak in a public forum for which the Court could find no compelling justification. *Id.* at 267, 102 S.Ct. at 273. The Commission's prohibition on all political speech is therefore a content-based restriction of speech despite its facial viewpoint neutrality. It will fare no better than the rule in *Widmar* unless justified by compelling state interests.

### 2. *Compelling State Interests*

Because I have found that the Heritage Commission's regulation is a content-based restriction of speech, the Heritage Commission must offer compelling state interests for its support.[4] The Commission must also demonstrate that the complete proscription of political paraphernalia is narrowly tailored to meet those ends.

The Heritage Commission defends its regulation on the grounds that the prohibition is necessary to avoid divisiveness and to promote ethnic brotherhood on Heritage Day. The Executive Director of the Commission has stated:

"The goal of the Heritage Festival is to foster brotherhood and understanding among the people of Rhode Island. We do that through the exchanging of ideas, customs, and traditions that exist amongst groups in Rhode Island. We have 23 ethnic subcommittees that are part of the Rhode Island Heritage Commission, and we asked them, once a year, to put on a Heritage Festival on the State House lawn. We asked for an atmosphere that fosters this brotherhood

and understanding amongst the groups. Our purpose in not allowing political activity is that this would not be a way of fostering brotherhood in the State of Rhode Island. We have the various subcommittees with their own histories of the countries that are foreign to the United States.... We have Irish and British Subcommittees and ask them to put aside their views and animosities for that one particular day and try to—you are in the United States now and you are living here, show us the customs and traditions that you have had, that you have brought with you to the United States. Do that through your foods, your songs, your dance and through the arts and crafts and the folk arts that you may have. Do that on that particular day."

(Deposition of Raymond E. Gallison, Jr. at 11–12)

The Commission fears that if they are compelled to allow NORAID to occupy a booth, then equally political groups of differing viewpoints will also demand access, thus embroiling the subcommittees and the Commission in an "international donneybrook." The Commission would like to avoid the political dissension which might arise if ethnic groups with competing political ideologies occupied the same area at the Festival. The defendants seek to demonstrate that any policy of permitting political groups equal access to the booths would be disruptive of the Festival's atmosphere of ethnic harmony.

However laudable the Commission's goal of preventing dissent and promoting brotherhood may be, avoidance of dissent has never been found to justify a content-based regulation of speech, unless the words "by their very utterance inflict

---

**4.** The defendants argue that the restriction on political paraphernalia and NORAID's participation in the Heritage Day festivities may be analyzed as a reasonable time, place, and manner restriction. In order to be a valid time, place or manner restriction, any regulation of speech must be content neutral, narrowly tailored to serve a substantial state interest and leave open ample alternative channels of com-

munication. *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983), *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 648, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1982). As I discussed in the preceding subsection, this regulation is not content neutral, since it contains a subject matter ban. The defendants' contentions fail as a matter of law.

injury or tend to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). To the contrary, one of the vital functions of freedom of speech is to invite dispute. *Terminiello v. City of Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949). Public inconvenience, annoyance or even unrest can never justify a curtailment of speech in the public forum. *Id.* "In our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969) (holding unconstitutional a ban on wearing armbands in schools because authorities feared disruption from the anti-Vietnam War message).[5]

The Commission seeks to justify its exclusion of NORAID on the grounds that allowing political groups into the booth area would be tantamount to requiring the Commission to sponsor two events at the same time—a cultural information exchange and a political rally. While recognizing that a public forum requires the state to provide equal access to all groups, *see e.g.,* *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 940 (1981) the Commission argues that public forum jurisprudence would not require that a forum be open to different groups for different purposes at the same time. As a general proposition, the defendants' argument is correct. The First Amendment does not require that a government open a public forum to conflicting groups for conflicting events at the same time. The Supreme Court has noted that two parades cannot march on the same street at the same time and the government may deny permission to one parade without running afoul of the

First Amendment. *See Grayned v. City of Rockford*, 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972), *Cox v. New Hampshire*, 312 U.S. 569, 576, 61 S.Ct. 762, 763, 85 L.Ed. 1049 (1941). The reasons for this permissible exclusion from a public forum are easy to discern. Two parades would cause chaos in public streets in the way one parade would not. Allowing two groups access to a forum at the same time would probably only ensure that neither group was granted an effective forum in which to make their views known. I can find, however, no incompatability between the informational activities of NORAID and the cultural exchange proposed by the Heritage Commission that would warrant finding that NORAID's inclusion in the Festival would force the commingling of two separate events in the same forum. The Heritage Festival is, at heart, an informational exchange. Dissemination of information regarding the social and cultural aspects of ethnic heritage is not incompatible with distribution of information regarding the political aspects of that same heritage. The means are the same, and neither message would be lost.

The Commission has expressed concern that if NORAID or other political organizations are allowed to participate in the Festival, then politics will take "center stage" on Heritage Day. The Commission fears that political speechmaking will find its way into the Festival through the booths and onto the stage area on the State House steps. The Commission's concerns, while not rising to the level of a compelling state interest sufficient to justify excluding NORAID from the booths entirely, will support a restriction on the kind of activities in which NORAID (or any other organization) may engage while occupying a booth.

---

5. The Commission's outright ban on political speech is no guarantee that the Heritage Day Festival will be devoid of political controversy. The defendants acknowledge that they may not lawfully exclude the plaintiffs from the lawn area on the day of the Festival. Thus, excluding the defendants from the booth area in no way ensures a peaceful festival since all political groups are free to roam the grounds and engage in all manner of controversial discourse. In fact, it may be noted that keeping NORAID in the booth may cause far less controversy at Heritage Day. If NORAID is allowed to participate in the festivities, interested visitors must seek NORAID out at the booth, thus reducing the risk of NORAID's accidental encounter on the lawn with proponents of opposite views.

While the Commission may not prohibit a "political" group's peaceful dissemination of leaflets, the sale and display of cultural artifacts, or the sale of food and drink from the booth, it may prohibit political speechmaking both from the booth area and from the stage area of the State House steps. Allowing political exhortations to the crowd from either area would be tantamount to requiring the Heritage Commission to sponsor both a Heritage Festival and a political rally and would considerably alter the nature of the festivities.[6]

The defendants contend that NORAID should be excluded from the Festival because NORAID's participation through the Irish subcommittee will align the state with an organization embroiled in international politics outside the State's proper province. The Committee, in essence, seeks to avoid stamping NORAID's political view with the State's imprimatur of approval. This issue is not new to this Court. In *Toward a Gayer Bicentennial Committee v. Rhode Island Bicentennial Foundation*, 417 F.Supp. 642 (D.R.I.1976) this Court held that a consortium of representatives of organizations dedicated to the concerns of persons of homosexual or bisexual preference could not be denied access to a limited public forum (the old Rhode Island State House) solely because the Bicentennial Commission believed that their endorsement of the activities would involve official approval. *Id.* at 645. At that time, this Court ruled that such a justification for a speaker's exclusion from a public forum is completely unacceptable,

and I do not deviate from that principle today. Government officials may not restrict access to a public forum merely because they disagree with the views to be expressed there. *See, e.g., Healy v. James*, 408 U.S. 169, 187–88, 92 S.Ct. 2338, 2349, 33 L.Ed.2d 266 (1972).[7]

The Heritage Commission has, in effect, attempted to banish NORAID to the bargain basement of the marketplace of ideas because of the views it espouses. It attempts to denegrate and discredit NORAID's message by denying it equal participation with the "nonpolitical groups" in the Heritage Day festivities. I note, too, that NORAID's exclusion would take place in the shadows of the State House, thus magnifying the indignity, and the apparent state approval of NORAID's outcast status. As Justice Black once warned:

"I do not believe that it can be too often repeated that the freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish." *Communist Party v. Subversive Activities Control Board*, 367 U.S. 1, 137, 81 S.Ct. 1357, 1431, 6 L.Ed.2d 625 (1961) (Black, J., dissenting).

In any endorsement scheme there is always a grave danger that the standards for official approval will serve only as a mask behind which the government hides as it excludes speakers from the public forum solely because of what they intend to say. As Judge J. Skelly Wright wrote:

---

6. For the same reasons, the Commission is entirely justified in requiring a nexus between any participant in the Festival and the ethno-cultural purpose of the Commission and the Festival. While the Commission may not prohibit political speech centered on the historical and current struggles of an ethnic minority, they need not allow, for example, a politician seeking elective office to occupy a booth.

7. In *Healy v. James*, a Connecticut state university sought to deny official recognition a local chapter of Students for a Democratic Society (SDS). Although the Student Affairs Committee voted to approve the SDS, thus, making it eligible for school funding and to use school facilities for meetings, the college president rejected

the group's application for official approval. The president justified his refusal on the grounds that the organization's goals were antithetical to the school's policies and commitment to academic freedom, and because the president doubted the local SDS' independence from the national organization well-known for its radical activities across college campuses at that time. *Healy v. James*, 408 U.S. 169, 170–76, 92 S.Ct. 2338, 2341–43, 33 L.Ed.2d 266, (1972). The Court held that the First Amendment prohibits the government from denying anyone the right to speak solely on the basis of his or her affiliation with an unpopular group. *Id.* at 185–186, 92 S.Ct. at 2348–49.

"If [First Amendment rights] could be exercised only when government is willing to offer its cosponsorship to the speaker, a system of free expression would be indistinguishable from a system of prior restraint." *Women Strike for Peace v. Morton*, 472 F.2d 1273, 1280 (1972) (Wright, J., concurring.) [8]

■ The Commission's final justification for excluding NORAID from the Heritage Day festivities is that NORAID has failed to comply with the Commission's rule that all funds received from Heritage Day festivities must be turned over to the Commission to be used to sponsor activities and events during the year. Evidence in the record tends to call into question whether this rule has been enforced uniformly against the Heritage Day participants. This dispute is not, however, material to the result I reach today. The Commission may exact, as a precondition to NORAID's official participation in the Heritage Day events, a commitment from NORAID that it will conform to the financial guidelines of the Commission. This precondition will not infringe upon NORAID's right to propagate its views amongst the visitors to the festivities, but is a minimal concession given in exchange for official participation in the day's events. *See, e.g., Healy v. James*, 408 U.S. 169, 192–93, 92 S.Ct. 2338, 2351–52, 33 L.Ed.2d 266 (1972) (ruling that the organization seeking official recognition from a college must agree to comply with reasonable restrictions imposed in the interest of the entire community).

■ The defendants offer that NORAID's exclusion from the booths is a minimal infringement on the plaintiffs' First Amendment freedoms, and that because the lawn area outside the Festival is open to the plaintiffs for their political discourse, this restriction should survive constitutional scrutiny. The availability of alternative forums for expressive activities will not, however, cure an otherwise defective content-based regulation. *Southeastern Promotions v. Conrad*, 420 U.S. 546, 556, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448, (1975). "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State*, 308 U.S. 147, 163, 60 S.Ct. 146, 151–52, 84 L.Ed. 155 (1939).

The Commission's regulation must fail for the additional reason that it is entirely unenforceable and leaves tremendous discretion in the hands of the Executive Board to decide what is and is not political. I note that the Heritage Day regulations do not define "political." It is a subject upon which reasonable minds may differ and the possibility of discriminatory enforcement is very real.

The plaintiffs have alleged that in 1985, the Black Heritage booths displayed a pamphlet entitled, "VOTE, Politics and the African Legacy." That issue is not denied, but the defendants' claim that they approached the Black subcommittee chairperson, Fred Williamson, and informed him that political information had been distributed from his subcommittee's booth. (Affidavit of Fred Williamson at 2). Mr. Williamson does not dispute that the pamphlet may have been inadvertently displayed at the booth. He does, however, dispute that the material is political.

"[T]he booklet entitled "VOTE, Politics and the African Legacy" should not be considered an advocacy pamphlet of a politically offensive partisan nature. The booklet contains papers by distinguished scholars that explore the rela-

---

**8.** Even if I were to accept the Heritage Commission's fear of affiliation with NORAID's views as a compelling state interest, I could not uphold this regulation because it is not narrowly tailored to that end. The Heritage Commission prints a program for the Heritage Festival which includes a map of the booths and a program of the day's entertainment. (Exhibit A, appended to the deposition of Robert C. Whit-

aker). The Commission could print on the program a disclaimer of any affiliation with or endorsement of the views of any of the groups occupying booths at the Festival. Thus, the Commission may achieve its goal of complete political neutrality without resort to a more drastic encroachment on NORAID's First Amendment guarantees.

tionship between race and politics in different parts of the world. The booklet was funded by the Rhode Island Committee for the Humanities, an affiliate of the National Endowment of the Humanities. It is a scholarly, informational booklet that contains reprints of essays delivered by humanities scholars at a symposium sponsored by the Rhode Island Black Studies Consortium. (Affidavit of Fred Williamson at 3.)

Clearly, as regards this particular pamphlet, one man's politics is another man's cultural heritage. Determining what is political is particularly difficult in the area of ethnic heritage since much of what we now consider our ethnic heritage derives from the political struggles of the past. The Commission's attempts to exclude political groups from Heritage Day amount to little more than a licensing requirement based on an undefined notion of what is political. "In the absence of narrowly drawn, reasonable and definite standards for the officials to follow," this kind of participation requirement must be condemned as a naked prior restraint on speech in the public forum. *Niemotko v. Maryland,* 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1951).

## III. CONCLUSION

For the foregoing reasons, I find that the plaintiffs are entitled to summary judgment as a matter of law.

I therefore order the following relief:

1. I hereby declare that the actions of the defendants in prohibiting the plaintiffs from distributing pamphlets pertaining to the situation in Northern Ireland and barring the attendance of Irish Northern Aid at the Heritage Day Festival for 1985 and threatening to prohibit the distribution of pamphlets pertaining to Northern Ireland and threatening to bar Irish Northern Aid from participation in Heritage Day activities for 1986, to be violative of the plain-

tiffs' First and Fourteenth Amendment rights; [9]

2. I declare all rules, regulations and guidelines of the Rhode Island Heritage Commission which prohibit the display or dissemination of political paraphernalia, including pamphlets, buttons, hats and pins to be void as offensive to the First and Fourteenth Amendments to the United States Constitution;

3. I permanently enjoin the defendants, their agents, servants, employees, officers and attorneys from in any way restricting the participation of the plaintiff Irish Northern Aid in Heritage Day 1986 and from prohibiting any of the plaintiffs from distributing or displaying political paraphernalia pertaining to conditions in Northern Ireland;

4. I declare that Irish Northern Aid may not, as part of its participation in the Heritage Day festivities, engage in political speechmaking or loud public oratory from the booth or stage area of the Heritage Day festival;

5. I declare that the Rhode Island Heritage Commission may exact Irish Northern Aid's commitment to comply with all financial regulations of the Commission as a precondition to Irish Northern Aid's participation in Heritage Day 1986;

6. I further order that the plaintiffs be awarded their costs and reasonable attorneys' fees in an amount to be determined at a subsequent hearing.

**9.** Because I hold that the regulation violates plaintiffs' First and Fourteenth Amendment rights of free speech, I do not reach the ques-

tions of state law or the allegations of equal protection violations.