**COMITE PRO–CELEBRACION del Centenario del Natalicio del Dr. Pedro Albizu Campos, Antonio Beltran, Mirta Ramirez Daniel Ramos, Jose Rodriguez Yolanda Mendez, and Reverend Doctor Jorge Morales, Plaintiffs,**

**v.**

**Forrest CLAYPOOL, General Superintendent of the Chicago Park District; and Chicago Park District Commissioners John Rogers, Jr., Joseph G. Phelps, William Bartholomay, George Vest, Jr., and Mona Castillo, Defendants.**

No. 93 C 5321.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 6, 1994.

---

Janis M. Susler, People's Law Offices, Raymond Antonio Figueroa, Figueroa Law Offices, Chicago, IL, for plaintiffs.

Randall E. Mehrberg, Sandra M. Toro, Nelson A. Brown, Jr., Chicago Park Dist., Steven A. Weiss, Kenneth Emanuel Kraus, Schopf & Weiss, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

El Comite Pro–Celebracion Del Centenario Del Dr. Pedro Albizu Campos ("El Comite") and its members have brought this suit against the Commissioners of the Chicago Park District ("Board") in their individual and official capacities.[1] The plaintiffs seek relief[2] under 42 U.S.C. §§ 1983 and 1988, alleging that the Board violated the First Amendment and the Equal Protection Clause of the Fourteenth Amendment when it refused to grant El Comite permission to erect a statue of Dr. Pedro Albizu Campos in Humboldt Park. The defendants have moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated below, the Board's motion to dismiss is granted in part and denied in part.

### Background

For purposes of this motion, the following factual allegations must be accepted as true. El Comite is a committee established to celebrate the centennial of the birth of Dr. Pedro Albizu Campos, and is comprised largely of Puerto Rican residents of the City of Chicago. (Compl. ¶ 1.) Dr. Campos was a Puerto Rican man who lead the Nationalist Party, a political group that advocated Puerto Rican independence. (Id. ¶¶ 4, 27.) He has been acknowledged and praised by many Latin Americans for his contributions to political and intellectual thought. (See id.) According to the plaintiffs, Dr. Campos is "one of the most significant and internationally ac-

claimed Puerto Rican political figures of the 20th Century." (Id.)

In August of 1992, El Comite started making plans to erect a six-foot tall statue of Dr. Campos in Humboldt Park, which is located in a predominantly Puerto Rican neighborhood. (Id. ¶¶ 6, 8.) In order to do so, the plaintiffs had to obtain permission from the Board. (See id. ¶ 7.) The Park District has established written guidelines for determining which statues and monuments it will accept. (Id. at Appendix.) The Board has delegated the responsibility for screening public donations to the Public Art Advisory Committee ("Advisory Committee"). (Id.) Apparently, if the Advisory Committee decides to accept a statue, Board approval is "a mere formality." (Id.)

On November 13, 1992, El Comite presented their plan to the Advisory Committee. (Id. ¶ 8.) As part of their proposal, plaintiffs agreed to pay the expenses of maintaining the statue. (Id. ¶ 18.) The Advisory Committee approved the concept and artistic merit of the statue, and agreed to recommend acceptance if the statue was cast in bronze. (Id. ¶¶ 9–11.) Because plaintiffs believed that approval by the Advisory Committee was tantamount to approval by the Board, El Comite raised $35,000 and proceeded to have the statue cast. (Id. ¶ 10.)

On or about July 2, 1993, former Park District Superintendent, Robert Penn, signed the recommendation for approval of the statue. (Id. ¶ 12.) However, the proposal was not passed on for several meetings, until eventually it was decided that the Board should hear speakers for and against erecting the statue. (Id. ¶¶ 13–15.) On or about July 27, 1993, the new Superintendent, Forrest Claypool, reportedly said that he opposed the plan because he disagreed with Dr. Campos's political beliefs and actions. (Id. ¶ 16.) On August 10, 1993, the Board officially refused to accept the statue. (Id. ¶ 19.)

There are no statues of Puerto Ricans in the Chicago Park District parks, or any-

1. The plaintiffs have voluntarily dismissed the claims against Forrest Claypool and Mona Castillo in their individual capacities and against George Vest entirely.

2. El Comite seeks compensatory and punitive damages in addition to mandatory injunctive relief.

where else in the City of Chicago. (*Id.* ¶ 20.) However, the Park District has accepted and erected approximately 16 monuments donated by Italian, German, Norwegian, Danish, Polish, Swedish, Bohemian, and Czechoslovakian organizations. (*Id.* ¶ 21.) El Comite claims that the Board violated the First and Fourteenth Amendments when it refused to erect the statue. (*Id.* ¶¶ 23–26, 29.) The defendants moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### *Motion to Dismiss*

■ "The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Triad Assocs. Inc. v. Chicago Housing Auth.,* 892 F.2d 583, 586 (7th Cir.1989). Therefore, a court should not grant a motion to dismiss unless the plaintiff is not entitled to relief under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). In deciding a motion to dismiss, the court assumes that the alleged facts are true, and draws every reasonable inference in the plaintiffs' favor. *Bowman v. Franklin,* 980 F.2d 1104, 1107 (7th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 2417, 124 L.Ed.2d 639 (1993).

### *Analysis*
### I. *FIRST AMENDMENT CLAIM*

■ Under the First Amendment, applied to the states through the Fourteenth Amendment, the states shall make no law abridging freedom of speech. In a First Amendment case involving an alleged abridgement of free speech, the court conducts a three-part inquiry: (1) it decides if the proposed speech is protected under the Constitution; (2) it determines the nature of the forum, because the extent to which the state can limit speech varies depending upon whether the forum is public or non-public; and (3) it evaluates whether the state's proffered justifications for restricting speech are sufficient to satisfy the standards applicable in that particular

forum. *See e.g., Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 797, 105 S.Ct. 3439, 3446, 87 L.Ed.2d 567 (1985).

### A. *Protected Speech*

■ Both parties assume the statue of Dr. Albizu Campos is expressive. (*See* Def.Mem. at 8.)[3] Nonetheless, the defendants insist that the Constitution does not protect the right to erect statues, arguing that "no tradition or constitutional right can be claimed by the general public to erect permanent statues on public property...." (*Id.* at 9.) In support of this position, the defendants rely heavily on *Lubavitch Chabad House, Inc. v. Chicago,* 917 F.2d 341 (7th Cir.1990). In that case, the City of Chicago refused to permit the plaintiffs to erect a menorah at O'Hare Airport during Chanukah because a municipal ordinance prohibited the display of religious symbols on non-leased public property. The plaintiffs argued that the denial violated their First Amendment right to freedom of expression, but the court disagreed, stating:

> We are not cognizant of ... any private constitutional right to erect a structure on public property. If there were, our traditional public forums, such as our public parks, would be cluttered with all manner of structures. Public parks are certainly quintessential public forums where free speech is protected, but the Constitution neither provides, nor has it ever been construed to mandate, that any person or group be allowed to erect structures at will. *Lubavitch,* 917 F.2d at 347.

Although the language quoted above may suggest otherwise when taken out of context, *Lubavitch* does not stand for the proposition that a statue is not speech, entitled to First Amendment protection. First of all, the language in *Lubavitch* concerning public forums is dicta because that case involved an airport, which is not a public forum. *Compare id.* (no right to erect a statue in an airport where statues had never been permitted before) *with Congregation Lubavitch v. Cincinnati,* 923 F.2d 458 (6th Cir.1991) (right to erect a

---

**3.** There is some evidence that the defendants understood the sculpture to express a political message. Specifically, Superintendent Claypool stated that he opposed the plan to erect the statue because he disagreed with Dr. Campos's political beliefs.

statue in a public plaza that historically had been made available for speech activities). Second, even the *Lubavitch v. Chicago* court recognized that a constitutional right to erect a statue could exist under some circumstances. *See Lubavitch v. Chicago,* 917 F.2d at 347.[4] In fact, numerous courts have treated statues as expressive structures. *E.g. Congregation Lubavitch v. Cincinnati,* 923 F.2d 458; *see also Students Against Apartheid Coalition v. O'Neil,* 671 F.Supp. 1105 (W.D.Va.1987). Therefore, the court is not persuaded that the First Amendment offers no protection for El Comite's statue.

### B. *Public Forum*

Having determined that the statue could be protected speech, the court turns to the critical issue of whether Humboldt Park is a public forum. If it is, the Board's ability to restrict expression is limited. If it is not, the state has considerable discretion to decide how citizens may use the property—or whether they may use it at all.

There are two types of public forums: traditional or designated. *International Soc. for Krishna Consciousness, Inc. v. Lee,* — U.S. —, —, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992). Traditional public forums are those places whose use is "inextricably linked with expressive activities." *Irish Subcommittee v. Rhode Island Heritage Comm'n,* 646 F.Supp. 347, 352 (D.R.I.1986). Parks, streets, and sidewalks are quintessential, traditional public forums. As the Supreme Court has stated:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and time out of mind, have been used for purposes of assembly, communicating thoughts between citizens and discussing public questions. Such use of the streets and public places has, from ancient times,

been a part of the privileges, immunities, rights and liberties of citizens. *Hague v. CIO,* 307 U.S. 496, 515–16, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (Roberts, J., concurring).

Public property that is not considered a traditional public forum may become a public forum if the state affirmatively opens the property to the public for the exercise of expressive activity.[5] A place that the state opens and dedicates for expressive activity is a designated public forum. Humboldt Park falls into the former category; it is a traditional public forum. As the Supreme Court has repeatedly explained, "streets, sidewalks, and parks, are considered, *without more,* to be 'public forums.'" *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983) (emphasis added). Nonetheless, the Board argues that the parks should not be considered public forums simply because it has accepted donations of other statues. (Def.Mem. at 10–11; Def.Reply at 5–6.) "[T]he Chicago Park District has not designated the government-controlled parks as forums for the general public to erect permanent structures. By merely accepting sporadic donations of structures ... the Park District has not intentionally opened a nontraditional forum for public discourse." (Def.Mem. at 11.) This argument misperceives the nature of Humboldt Park, which is a traditional public forum—not a designated public forum. A quintessential, traditional public forum is open for speech regardless of what the government does or intends. *See Kreisner v. City of San Diego,* 1 F.3d 775, 784–85 (9th Cir.1993) (rejecting argument that a park is not a public forum for large unattended displays). Since Humboldt Park is a traditional public forum, it is irrelevant whether the Park District has designated parks as public forums for erecting statues.

---

**4.** The court went on to explain that "First Amendment jurisprudence certainly does mandate that if the government opens a public forum to allow some groups to erect communicative structures, it cannot deny equal access to others...." *Id.*

**5.** Public property that has been designated as a public forum is treated a little differently than a traditional public forum. The state may open a

dedicated public forum for limited purposes only and may decide to close the forum later. *See e.g., Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* — U.S. —, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (explaining that public property which has been opened only for designated purposes remains non-public except for those specified purposes, and the state may exclude speech therein in a viewpoint-neutral manner).

Defendants make much of the fact that a statue is a permanent structure, (*see* Def.Mem. at 9–10; Def.Reply at 3–5), insisting that "the parks have *never* been a public forum for erection of permanent structures," (Def.Reply at 4.). The Board's argument erroneously assumes that the classification of a forum depends upon the type of speech. On the contrary, a traditional public forum retains its status as a public forum no matter what type of speech is involved. Basically, the Board has confused what should be two separate inquiries: (1) whether there is a right to speak in a particular place; and, if so (2) whether the right may be exercised at the time and in the manner proposed. The manner of the proposed speech is relevant to the second inquiry, but not to the first. Certainly, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired," (*Id.* at 10), and a proposal to erect a permanent structure presents unique problems, (*Id.* at 4, 5.). However, such concerns may be addressed by implementing appropriate time, place, manner restrictions—not by carving out exceptions to the general rule that parks are public forums for all types of speech.

### C. Content–Based Restriction

Since Humboldt Park is a traditional public forum, the Board's ability to restrict speech is limited. A content-based restriction of speech in a public forum is invalid unless it is necessary to serve a compelling state interest and narrowly drawn to achieve that end. *Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988). The overriding concept in First Amendment jurisprudence is content-neutrality. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).

The central inquiry with respect to content neutrality is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989); *see also Sefick v. City of Chicago,* 485 F.Supp. 644, 651 (N.D.Ill.1979). El Comite has alleged sufficient facts from which the court could decide that the Board's decision was content-based. Initially, the Board (through the Advisory Committee) found that the statue met all relevant criteria for acceptance. (Compl. ¶ 9.) In fact, the out-going superintendent signed the recommendation for approval. (*Id.* ¶ 12.) The statue was rejected only after the new superintendent, Forrest Claypool, stated that he would oppose the plan because he disagreed with Dr. Campos's political beliefs. (*Id.* ¶ 16.) From these facts, the court could conclude that the Board rejected the statue because of its political message. Therefore, the complaint states a claim under the First Amendment.

The defendants explain that the Board rejected the statue in order to avoid the controversy represented by Dr. Campos. (*See* Def.Mem. at 12.) That the Board wishes to avoid the entire controversy of Puerto Rican independence does not insulate its actions from First Amendment scrutiny. On the contrary, the First Amendment's hostility to content-based restrictions in public forums "extends to prohibitions on public discussion of entire topics for the simple reason that if the government was permitted to select the permissible subject matter of public discussion, the government could 'control ... the search for political truth.' " *Irish Subcommittee,* 646 F.Supp. at 354 (quoting *Consolidated Edison Co. v. Public Service Comm'n,* 447 U.S. 530, 537–38, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980)).

In addition, the Board argues that it can refuse to erect the statue in order to avoid endorsing Dr. Pedro Albizu Campos's political views. (Def.Mem. at 12–13; Def.Reply at 9–10.) Initially, we note that "if [First Amendment rights] could be exercised only when government is willing to offer its co-sponsorship to the speaker, a system of free expression would be indistinguishable from a system of prior restraint." *Women Strike for Peace v. Morton,* 472 F.2d 1273, 1280 (D.C.Cir.1972) (Wright, J., concurring).

The First Amendment was designed to protect the voice of the people, not of the government. *Id.* As such, Government officials are not permitted to restrict access to a public forum merely because they disagree with the views to be expressed. *See id.* Nonetheless, courts have been willing to recognize a compelling government interest in avoiding the appearance of endorsement when promoting free speech raises the possibility of an Establishment Clause violation. *E.g., Chabad–Lubavitch of Georgia v. Miller,* 5 F.3d 1383 (11th Cir.1993). Even if the avoidance of endorsement could be compelling in the absence of religious concerns, the Board would still be required to show that it protected its interest in a manner which was narrowly tailored.

**D.  Content–Neutral, Time, Place, Manner Restriction**

In deciding that Humboldt Park is a public forum, the court does not imply that any infringement on the right to erect an expressive statue would be unconstitutional. The First Amendment does not provide absolute protection to all speech under all circumstances. *See e.g., Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (no right to round-the-clock vigil in a public park). The Board may regulate the time, place and manner in which expressive activities take place. Such restrictions must be content-neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels for communication. *Ward,* 491 U.S. at 791, 109 S.Ct. at 2753–54. Courts have recognized several significant government interests which could support restrictions on speech: preserving the aesthetic environment, *Clark,* 468 U.S. at 296–99, 104 S.Ct. at 3070–72; maintaining security on public grounds, *Community for Creative Non–Violence v. Kerrigan,* 865 F.2d 382, 391 (D.C.Cir.1989); ensuring that public art has substantial artistic and cultural significance, *Silvette v. Art Comm'n,* 413 F.Supp. 1342, 1346 (E.D.Va.1976); and ensuring that public art is compatible with the use of the proper-

ty, *Serra v. U.S. General Services Admin.,* 847 F.2d 1045, 1050 (2d Cir.1988). The court's decision today does not preclude the Board from coming forward with any evidence showing that its rejection of El Comite's statue was narrowly tailored to serve such a significant government interest.[6]

The defendants insist that the fact that alternative channels of communication are available requires dismissal of the complaint. (*See* Def.Mem. at 12–13; Def.Reply at 7–10.) The court does not agree. The fact that there are alternative channels of communication is not enough to justify a restriction on speech in a public forum, the regulation must also be narrowly tailored. Therefore, the mere fact that the statue is being displayed elsewhere does not justify dismissal of El Comite's complaint.

**E.  Other First Amendment Concerns**

Even if the Board's decision was not based upon the message the statue conveys and even if the Board has properly adopted content-neutral criteria for rejecting proposed statues, there are facts from which the court could conclude that the Board violated the First Amendment. Facially neutral restrictions on speech will be struck down when they "suffer from the more covert forms of discrimination that may result when arbitrary discretion is vested in some governmental authority." *Heffron v. International Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 649, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981); *see also Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 762–69, 108 S.Ct. 2138, 2147, 100 L.Ed.2d 771 (1988) (government may not condition speech on obtaining a license from an official who has boundless discretion).

Here, it appears that the Board has adopted regulations and objective criteria which notify the public of its legitimate concerns regarding permanent structures in public parks. (*See* Compl. at Appendix.) For instance, before granting approval, the Advisory Committee considers the statue's

---

6. Accordingly, the Board may come forth with facts supporting its argument that rejecting El Comite's statue furthered its interest in prevent-

ing parks from becoming overcrowded. The Board's arguments to this effect were premature because they could not be supported with facts.

potential impact upon historic buildings, recreational facilities, landscape, and other features of the park.. In addition, the Advisory Committee takes into account potential liability and maintenance problems. Nevertheless, the allegations suggest that the Board did not adhere to these guidelines in this instance; rather, the Board rejected El Comite's statue *even though* it met all relevant criteria. If the Board applied ostensibly neutral criteria in a discriminatory manner, it may have violated the First Amendment.

Finally, the defendants insist that there is no right to force a gift upon the government, citing three cases in which courts upheld the government's right to refuse a donation. (Def.Mem. at 3–6; Def. Reply at 1–3) (citing *Silvette*, 413 F.Supp. 1342 and *Via v. Richmond*, 543 F.Supp. 382 (E.D.Va.1982) and *Avin v. Rutgers*, 385 F.2d 151 (3d Cir.1967)). The defendant argues, "the donors in these cases lost because their First Amendment claims could not overcome the recipient's right to refuse the gifts." (Def. Reply at 3.) The court rejects defendants' contention that the government has an unfettered right to refuse to display artwork in spite of the First Amendment.

First, the court finds it significant that none of the cases cited by the defendant involved a public forum. *See Silvette*, 413 F.Supp. 1342 (campus building in state-operated university); *Via*, 543 F.Supp. 382 (public library); *Avins*, 385 F.2d 151 (state-funded law review). The importance of this fact is that the government had considerably more discretion to regulate speech in those cases than it does here, where a quintessential public forum is involved.

Second, in all three of those cases, the state rejected the donations for failure to meet objective quality standards. *See Silvette*, 413 F.Supp. 1342 (painting did not have substantial artistic and cultural merit); *Via*, 543 F.Supp. 382 (magazine was of low quality); *Avins*, 385 F.2d 151 (article did not meet publishing standards). In this case, there are facts suggesting that the Board's decision was based upon the message the statue conveys—not upon its value. In light of these distinctions, the court holds that, although the government has a right to reject dona-

tions, it must exercise that right consistently with the First Amendment.

## II. FOURTEENTH AMENDMENT CLAIM

The complaint does not state a claim for relief under the Fourteenth Amendment because plaintiffs fail to sufficiently allege that the Board rejected the statue because of the plaintiffs' nationality. In order to constitute a violation of the Equal Protection Clause, the defendants must purposefully and intentionally discriminate against the plaintiffs because of their membership in a racial or ethnic group. *Personnel Adm'r v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). At a minimum, the allegations must suggest that racial animus was a "motivating factor." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Where direct evidence is not available, the plaintiff may point to a pattern of action that disproportionately burdens an ethnic group and which is unexplainable on grounds other than race. *Id.* at 266, 97 S.Ct. at 563–64.

El Comite's complaint fails to set forth sufficient facts. First, the plaintiffs, themselves, have offered a non-discriminatory explanation for the Board's actions. Specifically, El Comite claims that the Board rejected their proposal because it did not agree with Dr. Campos's political beliefs. By their own argument, plaintiffs suggest that there are non-discriminatory—albeit potentially unconstitutional—explanations for the Board's action.

In addition, the complaint fails to set forth a discernible pattern of discrimination evidencing racial or ethnic animus. The plaintiffs note that the Board has accepted 16 monuments from other ethnic organizations and that there is no monument commemorating Puerto Rican culture. (*Id.* at 21.) However, the plaintiffs concede that their proposal was the first attempt to erect a statue of a Puerto Rican. (Resp.Br. at 21; Compl. ¶ 29.) These facts fail to present a pattern of dis-

crimination from which the court could construe discriminatory intent. As such, the allegations are insufficient to state a claim under the Fourteenth Amendment.

### Conclusion

For the reasons stated herein, the defendants' motion to dismiss is denied with respect to the plaintiffs' First Amendment claim, but granted with respect to the Fourteenth Amendment claim.