CAPITAL AREA RIGHT TO
LIFE, INC., Movant,

v.

DOWNTOWN FRANKFORT, INC.; John
Gray, Individually and John Gray as
President of Downtown Frankfort, Inc.,
Respondents.

No. 92–SC–347–DG.

Supreme Court of Kentucky.

July 1, 1993.

Rehearing Denied Oct. 28, 1993.

Phyllis A. Sower, Frankfort, Walter M.
Weber, Free Speech Advocates, New Hope,
Alice W. Hobson, Frankfort, for Movant.

John H. Gray, Frankfort, for Respondents.

LEIBSON, Justice.

The respondent, Downtown Frankfort, Inc.
(DFI) is a non-profit corporation established
to promote downtown revitalization in Frank-
fort, Kentucky. John Gray is its president.
As one of its activities, DFI organized and
sponsored a "Great Pumpkin Festival" as a
special event to be held on the city's St. Clair
Mall, on Saturday, October 27, 1990.

Capital Area Right To Life, Inc. (CARTL)
had a booth at the 1989 Festival, but was
denied a permit to have a booth at the 1990
Festival, being advised by letter from Presi-
dent John Gray that DFI had decided upon a
"policy on the issue of festival participation"
under which "theme festivals, events, and
booths are meant to be for fun and entertain-
ment, [and] DFI reserves the right to deny
participation to any displayer/merchandiser

deemed inappropriate to that theme and purpose." Additionally, Gray advised CARTL orally that it could not have a booth because it was a "controversial group." This 1990 festival policy evolved because, at the 1989 Festival, DFI had received complaints from many festival-goers, as well as other festival participants, about the inappropriateness of advocacy groups such as CARTL participating in a family-oriented Halloween/Fall Festival. At oral argument both sides took note that, at the 1989 Festival, CARTL's booth had distributed plastic models of fetuses in little baskets.

The record shows that DFI's 1990 festival policy was applied evenhandedly in that CARTL's counterparts, Kentucky NOW and the Kentucky Religious Coalition for Abortion Rights, were also denied participation as not in keeping with the Halloween/Fall Harvest theme of the "Great Pumpkin Festival."

CARTL filed suit in Franklin Circuit Court against DFI and Gray alleging "the actions of the Defendants jointly and severally deprived the Plaintiff of its rights under the First and Fourteenth Amendments to the United States Constitution (more specifically, abridging the freedom of speech), unlawfully restricts the use of public property and denies to the Plaintiff equal access to a public forum." CARTL sought relief under the Kentucky Declaratory Judgments Act (KRS Chapter 418) and the Federal Civil Rights Act (Title 42, U.S.Code, Sec. 1983).

The trial court denied the injunction and entered summary judgment for the defendants, Gray and DFI. The Kentucky Court of Appeals panel affirmed; one judge dissented. Because the case involves freedom of speech, a constitutional issue of great public importance, we granted discretionary review. For reasons to be stated, we affirm.

The evidence in this case consists solely of affidavits filed on behalf of the parties concerned. These affidavits are not in conflict on any facts material to deciding this controversy. Thus, while we differ with the trial court and the Court of Appeals about the reasons for deciding DFI's actions did not violate CARTL's constitutional rights, we agree this was a proper case for summary judgment.

On appeal, CARTL addressed, for the first time, freedom of speech provisions in our Kentucky Constitution (Ky. Const., Sec. 1(4) and Sec. 8), in addition to the federal constitutional law arguments CARTL presented at the trial level. We will not undertake to decide whether the right to frame arguments based on the Kentucky Constitution has been lost by procedural default, because CARTL offers no differences between the two constitutions pertinent to the issues in this case.

This case was decided in the trial court and in the Court of Appeals on grounds that DFI and Gray are private parties, not public entities, and that the Fourteenth Amendment, and through it First Amendment rights, do not apply to private parties unless those parties are engaged in activity deemed to be "state action." *Jackson v. Metropolitan Ed. Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Having stated the issue in the simplest of terms, the application of the principle became exceedingly complicated. Both courts below engaged in labored analysis of various factors and tests applied to decide the "state action" question in a multiplicity of decisions (most of them unrelated to abridging or restricting free speech), ultimately deciding that DFI and Gray were not state actors when they denied CARTL a permit to operate a booth at the festival.

The trial court analyzed the case using three tests: the "public function test," which asks whether private actors are "performing functions traditionally the exclusive prerogative of the city"; the "state compulsion test," which asks whether "the city has exercised coercive [sic.] power or has provided such significant encouragement, either overt or covert, that choice must in law be deemed to be that of the city"; and the "nexus test" which asks whether the city and DFI were "intertwined in a 'symbiotic relationship'" such that they were "joint participants." The trial court concluded:

"Applying the three tests to the facts at hand it becomes apparent that DFI was not performing a city function. It follows that the plaintiff was denied no constitutional right."

The Court of Appeals took the inquiry one step further, addressing the question posed in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939, 102 S.Ct. 2744, 2755, 73 L.Ed.2d 482, 497 (1982):

"Whether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation.... 'Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.'"

After separately analyzing the factors and tests applied in many different cases, the Court of Appeals concluded:

"From all the foregoing we have observed that every case must be examined from the facts of each situation; that the receipt of state funds does not convert private actors to state actors; and that in the case at bench the government is not in the business of conducting festivals. Neither can it be said that there was any duty, legal or otherwise, for the city or county to promote or revitalize downtown Frankfort or, for that matter, any other area within their respective boundaries.... CARTL has failed in establishing that DFI was performing a public function."

■ The Court of Appeals reached its decision by separately analyzing each reason proffered for attaching the "state action" label to DFI's activities, and then rejecting each in turn on the basis DFI's activities did not prove state action. The Dissenting Opinion by Judge Huddleston reached the opposite conclusion by considering DFI's activities in the aggregate. Judge Huddleston conceded that "examined separately and in light of existing United States Supreme Court decisions these factors do not individually represent a significant degree of state action," but concluded "as the Supreme Court has stated, 'the dispositive question in any state-action case is not whether any single fact or relationship presents a sufficient degree of state involvement, but rather whether the aggregate of all relevant factors compels a finding of state responsibility.' *Burton v. Wilmington Parking Authority,*

365 U.S. 715, 722, 81 S.Ct. 856 [860], 6 L.Ed.2d 45, 50 (1961)." We agree with the Court of Appeals' Dissenting Opinion that "[u]pon weighing the circumstances of this case" in the "aggregate," DFI qualifies as a state actor.

There are many factors that point to this conclusion. DFI is incorporated as a private, non-profit corporation, but its purpose is to bring about "revitalization" of Downtown Frankfort. This is a function it took over from the city to the extent of carrying out the "Main Street Program," which is operated under the patronage and guidance of the Kentucky Heritage Council, an agency of state government under the Education and Humanities Cabinet. KRS 171.3801 and 171.381. DFI's principal funding is from monies received from the Kentucky Heritage Council, from the City of Frankfort, and from the Franklin County Fiscal Court, although it also charges dues to its members and presumably accepts private contributions.

One of the functions of the Kentucky Heritage Council is the "administration" of a "grants program" which includes the "Main Street Program," the impetus behind the "Great Pumpkin Festival." The unrefuted affidavit from John R. Sower, formerly Mayor of the City of Frankfort from 1978–82, filed on behalf of CARTL states:

"Downtown Frankfort, Inc., has in fact taken over a function formerly performed by the City of Frankfort. The City used to hire its own staff to promote the revitalization of downtown as a place to live, visit, shop, invest, etc. During the affiant's term as Mayor, the City received a 'Main Street' program fund for this purpose and hired Randy Shipp and Todd Graham to promote downtown Frankfort."

Finally, and of great significance, the St. Clair Mall upon which this festival is conducted is a public area, but a permit for a booth on this public area must be obtained from DFI: "no formal city permit is issued." Thus the city has delegated to DFI control over the St. Clair Mall, albeit only to the limited extent of deciding who shall be permitted to maintain booths there during the hours of the festival.

These factors leave no room to doubt that the activities engaged in by DFI in conducting the "Great Pumpkin Festival," in the aggregate, constitute state action.

In one of the latest U.S. Supreme Court cases on the subject of state action, *Edmonson v. Leesville Concrete Co.,* 500 U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), a case cited by both sides as supporting authority, the Court held that the exercise of peremptory challenges by private litigants in civil cases, if exercised in a racially discriminatory manner, involves sufficient "interdependence" or "joint participation" in the exercise of governmental authority that it should be viewed as state action. The Court considered the private party status of the actor outweighed by the public nature of the function being performed: ". . . when private litigants participate in the selection of jurors, they serve an important function within the government and act with its substantial assistance." *Id.* at ——, 111 S.Ct. at 2087, 114 L.Ed.2d at 678.

The *Edmonson* case supports CARTL's "state action" claim in this case. Like the Leesville Concrete Co. in *Edmonson,* here DFI's case against classifying its activities as state action rests on its claim it is a private non-profit organization rather than a state agency. This begs the question. In the context of the issue before us, DFI's right to restrict participation by CARTL in the "Great Pumpkin Festival," the issue is whether DFI is involved in a "symbiotic relationship" with government, a relationship involving close, mutually beneficial association of two dissimilar entities. What constitutes a "symbiotic relationship" is a multifaceted question, elusive because the term has different meanings depending upon the context of the case. *See* for discussion: *Edmonson v. Leesville Concrete Co., supra; Burton v. Wilmington Parking Authority, supra* and *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

■ Thus we conclude that in conducting the "Great Pumpkin Festival" and setting policy as to what individuals, groups or organizations could maintain booths at the festival, the activities of DFI and Gray constituted state action. But this does not end the inquiry: state action of this nature does not necessarily abridge the constitutional right of free speech. This, also, depends on the circumstances. From the many cases cited to us, the U.S. Supreme Court case that seems closest to the present one factually, and the case which we look to for guidance, is *Heffron v. Int'l Soc. For Krishna Cons.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).

In *Heffron,* the Minnesota Agricultural Society, a public corporation charged with operating Minnesota's annual state fair, restricted the activities of the Krishna's Society to distributing literature and soliciting donations within the fairgrounds to assigned locations. Its rules "require that any exhibitor conduct its sales, distribution, and funds solicitation operations from a booth rented from the Society. Space in the fairgrounds is rented to all comers in a nondiscriminatory fashion on a first-come, first-served basis with a rental charge based on the size and location of the booth. The Rule applies alike to nonprofit, charitable, and commercial enterprises." 452 U.S. at 644, 101 S.Ct. at 2562. "[T]he Rule does not prevent organizational representatives from walking about the fairgrounds and communicating the organization's views with fair patrons in face-to-face discussions." *Id.* at 643–44, 101 S.Ct. at 2562.

There is no doubt the public agency engaged in conducting the state fair was engaged in state action. Yet the Opinion upholds the restrictions in the state fair rules against First Amendment challenge. The Court takes note that "[t]he State does not dispute . . . Krishnas' religious views and doctrines is protected by the First Amendment." 452 U.S. at 647, 101 S.Ct. at 2563. The Court then states the following principle applicable in cases of this nature:

"It is also common ground, however, that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired. [Cases cited.] . . . the activities of ISKCON [the Krishna Society], like those of others protected by the First Amendment, are subject to reasonable time, place, and manner restrictions. [Cases cited.] 'We have often approved

restrictions of that kind provided they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in doing so they leave open ample alternative channels for communication of the information.' [Cases cited.] The issue here ... is whether Rule 6.05 is a permissible restriction on the place and manner of communicating the views of the Krishna religion,...." *Id.* at 647–48, 101 S.Ct. at 2563–64.

We consider the issue before us the opposite side of the same coin. We interpret "content-neutral," as used in *Heffron,* to include being neutral as to the type of message the restriction permits as well as being nondiscriminatory between messages of the same type, so long as there is a logical and legitimate reason for restricting the type of message. The issue here is not whether DFI was involved in state action in regulating the use of the Mall, but whether the manner in which it regulated the use of the Mall on this occasion constituted "reasonable time, place, and manner restrictions." *Heffron, supra,* 452 U.S. at 647, 101 S.Ct. at 2564. DFI was engaged in restricting those who could maintain a booth to entities consistent with the festival's theme and subject matter. Thus the St. Clair Mall was a public area, but its use on this occasion is analogous to the use of the fairgrounds in the *Heffron* case. So long as it applied its policy in an evenhanded, nondiscriminatory manner consistent with a legitimate purpose expressed in a specified policy, its policy is content-neutral in the only sense that is important to this case.

CARTL and its counterparts were free to walk about the Mall and exercise the right of free speech free of any supervision or restriction from DFI. The Mall was not a private area policed by DFI security officers, but a public area, the policing of which was left to public officials. DFI did not deny access to the St. Clair Mall to persons or organizations wishing to engage in "controversial" speech; it only denied such entities a permit for booth space during the hours of the festival.

It is a critical fact in this case that CARTL's counterparts, NOW and the Religious Coalition for Abortion Rights, were also denied booths in keeping with the festival's theme. It is also a critical fact that the scope of DFI's activities did not include controlling speech on the Mall in any manner except restricting permits for booths to groups consistent with the theme of the festival. None of these organizations were in any manner prohibited from using the Mall to communicate freely with others attending the festival, not limited in any way by DFI and Gray, but limited only by the lawful exercise of police power in a public place by public agencies. Given these facts we see no significant difference between the reasonableness of the limitations on the Krishna Society in the *Heffron* case, and the limitations on CARTL in the present case.

In *Heffron* the U.S. Supreme Court stated:

"Furthermore, consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be asserted in light of the characteristic nature and function of the particular forum involved." 452 U.S. at 650–51, 101 S.Ct. at 2565.

The restriction here was consistent with "consideration of [the] forum's special attributes." The restriction did not address the content of the message, but only the type of message for which a booth would be suitable. It did not restrict the exercise of free speech at the festival except to limit the "manner" of its exercise. Like *Heffron* it was a reasonable limitation on "time, place and manner."

For the reasons stated, we affirm.

STEPHENS, C.J., and COMBS, LEIBSON and REYNOLDS, JJ., concur.

SPAIN, J., concurs in results, but further concludes that the actions of DFI did not amount to state action under the circumstances.

WINTERSHEIMER, J., dissents by separate opinion in which LAMBERT, J., joins.

WINTERSHEIMER, Justice, dissenting.

I respectfully dissent from the majority opinion because the discriminatory activities of DFI in refusing a booth at the Great

Pumpkin Festival to Capital Area Right to Life, Inc. constituted impermissible state action and as such is a clear denial of the constitutional right of free speech.

The majority opinion notes that we must look for guidance to *Heffron v. International Society For Krishna Cons.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), and then states that it considers the issue before this Court as the opposite side of the same coin. The majority opinion proceeds to interpret "content-neutral" in a rather novel manner in which the use of the public square was regulated by DFI so as to discriminate. It is an illusion to claim that those who were denied the right of a booth could freely circulate in the mall area and consequently their free speech rights were not abridged. Certainly such a contention begs the question. Anyone could exercise free speech in the public square; the discrimination lies in the prohibition to fully participate with a booth in the festival. It is obvious that the application of the policy by DFI was not even-handed and was discriminatory with no legitimate relationship to any proper public policy.

Unfortunately, the majority opinion has totally misunderstood *Heffron, supra*, and misapplied it to this situation. Candidly, the majority opinion admits that its interpretation of *Heffron* is the "opposite side of the same coin." However, *Heffron* was a case where the United States Supreme Court, in unmistakably clear language, reversed a decision by the Minnesota Fair Board which would have restricted Krishna to their booth. Clearly all the parties in that case accepted the fact that the Krishna had a right to have a booth at the fair. The only legal issue was the right to restrict the Krishna participants from leaving the booth and walking around through the crowd. The Supreme Court determined that the state fair rule did not violate the First and Fourteenth Amendments because there was a defined standard for participation by means of circulation in the crowd and that the group was not denied the right to arrange for a booth and distribute literature or solicit funds from such a location.

In this case, the right to fully participate by means of a booth was denied by DFI

although the majority opinion generously allows CARTL members to walk through the festival and exercise free speech without supervision or restriction.

To say that an individual enjoys freedom of speech except as to the question of the content of the speech is contradictory to the real meaning of the First Amendment. It is similar to saying you have a right to free speech as long as the state can control what you say. Such an analysis is seriously flawed.

The majority opinion may be sincere in stating that "CARTL and its counterparts were free to walk about the mall and exercise their free speech without any supervision or restriction from DFI." It is a non sequitur to say that DFI only denied a permit for booth space and not the right to engage in what it calls "controversial speech."

If the state has a right to examine the content of speech and to deny its free exercise simply because it denies the free exercise of others, then free speech means nothing. This case is only about free speech. It is not about abortion.

In this case there is no record of any disturbance or controversy. Consequently there is no factual, legal or logical basis in the record on which DFI could deny a booth permit to any of the groups requesting booth space. There is no evidence of disorder or even a record of any single complaint. Considering the vague unspecified generalities on which DFI bases its discriminatory behavior, one could only conclude that it is simple, unadulterated censorship. The rhetoric of the majority opinion cannot dispel this simple unvarnished fact.

The majority opinion has stumbled over the threshold of free speech and has fallen into the morass of a misinterpretation of the term "content-neutral." Apparently, the opinion cannot get up. The neutrality of the standards governing the licensing authority must be objective, definite and nondiscriminatory. *See Shuttlesworth .v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). It is the regulation that must be content-neutral rather than a direct inquiry into the nature of the speech. The content is important only as it relates to a

significant government interest in maintaining orderly crowd movement or the public health or safety. Any restriction on free expression should not be overly intrusive. Perhaps this is a difficult concept to grasp, but it is most important in determining the right to free expression.

When public property is used to promote a public purpose such as revitalization, the fact that the government is involved requires open access to all the public. An entirely private fund and entertainment festival or promotion is free to do as it chooses, but that is not so when government funds or public property is involved. It has been held that the lease of a city convention hall is not state action and that a private entity could refuse to allow the press and supposedly the public into the convention hall. *Cf. NBC v. Communications Workers of America*, 860 F.2d 1022 (11th Cir.1988).

The decision of DFI to ban CARTL's booth was not content-neutral, rather it was entirely content-based. It amounts to simple prior restraint or censorship. It is based on what is said while totally ignoring the right to say it.

The analysis provided by the majority opinion might well be thought of by Kentucky legal scholars as an excellent example of true judicial activism. The issue of content-neutral was only marginally discussed in either briefs, trial or appellate court. DFI, in its brief, states that *Heffron, supra,* is not on point because the Minnesota action was obviously state action. The majority opinion clearly admits several times that the festival committee qualified as a "state actor." It states "we agree with ... the dissenting opinion" that DFI qualifies as a state actor.

The facts are very critical to a complete understanding of this case. Downtown Frankfort, Inc. is a nonprofit corporation whose exclusive purpose is the revitalization and promotion of the downtown Frankfort area as a business and commercial center and as a desirable place for people to live, work, shop and visit. The record indicates that DFI organizes various public events on the city streets and sidewalks and the city-owned St. Clair Mall.

The event in question is named "The Great Pumpkin Festival" and was held October 27, 1990. DFI sponsored the same festival in 1989 and an affidavit from the secretary of the organization indicates that the permission received from city government to use the mall area was to hold "Great Pumpkin" activities and to allow vendors, civic groups and others to set up sales and informational booths. Capital Area Right to Life received permission from DFI to participate in the 1989 event and set up a booth. The record is devoid of any incident or disturbance of any kind relating to the Right to Life booth. An affidavit in the record indicates that a similar festival entitled "Dog Days" was sponsored by DFI in August of 1990 and CARTL was denied a booth. However, two months prior to the Pumpkin festival, DFI's President Gray indicated that Right to Life would be welcomed "with open arms" at future events. The record indicates that DFI placed an ad in the local newspaper, The State Journal, soliciting participation from various civic organizations by means of booth rental. When CARTL applied for a booth, DFI's president denied the request as "too controversial."

On October 2, 1990, the DFI Board of Directors adopted a festival policy which reserved to it "the right to deny participation to any display or merchandiser deemed inappropriate to that theme and purpose" which was fun and entertainment. At the same meeting DFI again denied CARTL's request for a booth on the basis that such participation was inconsistent with the new festival policy.

In 1990, DFI was primarily funded with public money from the City of Frankfort, the Franklin County Fiscal Court and the Kentucky Heritage Council and some membership dues. Members of the board at that time included officials from the city, county and Heritage Council.

The festivals sponsored by DFI are held exclusively on public property, either a mall, sidewalk or city streets. Apparently no written permit was ever issued by the city to DFI.

Other critical facts involve a dispute between counsel at oral argument as to whether the CARTL advocates were orderly or

otherwise. There is nothing in the record indicating any disruption of any activity. The statements by DFI that CARTL is too controversial are vague and undocumented. At oral argument, counsel for DFI admitted that there had been no record kept of any of the alleged complaints. In fact, DFI does not assert that there was any disorder, only that the group was "too controversial" and "inappropriate." CARTL maintains that it distributed 200 balloons and had available literature and other information in 1989. DFI contends that the CARTL activities were bothering some people attending the festival. Again, the record is totally silent as to any question of disorder or disruption.

As conceded by the majority opinion, DFI was a state actor. Certainly, totally private conduct, whether discriminatory or even wrongful, is not prohibited by the Fourteenth Amendment to the Federal Constitution. Anyone who engages in a purely private activity does not invade individual rights unless the State becomes involved to some significant extent. *Cf. Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). However, private persons and entities may be held to be state actors where the alleged infringement of a right is fairly attributable to the State. *West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

There have been various tests applied to state action. The functional approach has been most recently noted in *Georgia v. McCollum*, 505 U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). It is interesting to note that although this case was decided on the basis of a summary judgment, the United States Supreme Court in *Edmonson v. Leesville Concrete Company*, 500 U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), held that the issue of whether private conduct constitutes state action is a factual inquiry. The seemingly simple question of ascertaining whether any private individuals become state actors can result in a complex legal situation. *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) stated that the effort to determine "neutral principles" in the area of government action was an impossible task.

Any extension of the philosophy unwittingly expressed by DFI in this situation could possibly exclude a booth by an environmental group, the NAACP or a church with religious articles of any kind on display or any literature connected therewith. Certainly, I doubt the State can justify restrictions that exclude anyone on the basis of race, gender, religion or free speech simply by delegating a governmental function to a private entity or by permitting a private party to assume a governmental function.

It would appear that DFI has perhaps unthinkingly subjected individuals and other groups to a prior restraint on any participation at a public event on public property. Surely the State cannot selectively exclude individuals or groups from participating in public activities based on a subjective determination that such an individual or group is "inappropriate" to its theme or purpose or that it is "too controversial" without any supporting evidence and without any record of previous disturbance. Obviously the question becomes what is inappropriate and who determines what is inappropriate.

When it is decided that an individual or group cannot fully participate in a public event then the use of State property as a traditional public forum for the exercise of the fundamental right of free speech is dramatically restricted. Legitimate First Amendment rights have been infringed. *Cf. Southeastern Promotions Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

Once the majority opinion recognizes that DFI engaged in state action, the ultimate decision should be obvious. The right to freedom of expression and free speech by means of participation in the festival with a booth should be clear. Such a right should be held by any group in the absence of some obvious danger to public safety or health. The record here discloses no such danger. Any group would enjoy the same right to free expression. The public enjoys the right not to listen to the message of any group, but that is the right of the individual and the State may not suppress the message.

In *Heffron*, there was no dispute that Krishna was entitled to a booth at the Minnesota State Fair. CARTL repeatedly argues that the booth was a "given". The United States Supreme Court observed that space at the Minnesota fair was rented in a nondiscriminatory fashion, on a first come/first served basis and that this allocation applied alike to nonprofit, charitable and commercial enterprises. The method of allocating space in *Heffron*, *supra*, was not open to the kind of arbitrary allocation that the U.S. Supreme Court has condemned as inherently inconsistent with a valid time, place and manner regulation. However, such discretion has the potential for becoming a means of suppressing a particular point of view.

*Heffron* correctly notes that valid time, place and manner restrictions on the exercise of First Amendment rights must serve a significant governmental interest and *may not be based on either the content or subject matter of the speech.* (Emphasis added.)

The seeming assumption by DFI that they can exclude everyone from expressing their First Amendment rights is without any foundation in law. Although it may be unintentional it is a clear abridgement of the right to free speech.

The United States Supreme Court noted in *Heffron* that:

> These nonreligious organizations seeking support for their activities are entitled to rights equal to those of religious groups to enter a public forum and spread their views, whether by soliciting funds or by distributing literature.

452 U.S. at page 653, 101 S.Ct. at page 2566, 69 L.Ed.2d at page 309.

It should be clear that when a private party acting as the State, sponsors an event open to the general public on public property, it cannot exclude certain participants on the basis of a vague, standardless policy. The First Amendment protects expressions of speech in public places whether such expressions are popular or unpopular. It does not require citation for the court to recognize that free speech rights have been accorded to draft resisters and flag burners. Certainly the distribution of balloons and literature

would seem not to be disruptive in any fun and entertainment festival.

This situation is very close to the establishment of a policy that determined who could use public property and be included in full participation in public events similar to that denounced in *Citizens to End Animal Suffering and Exploitation, Inc. v. Faneuil Hall*, 745 F.Supp. 65 (D.Mass.1990). In that case, Faneuil Hall leased the marketplace from the City of Boston and refused to permit a citizen's group to distribute literature and protest inhumane treatment of calves. Faneuil Hall was found to have engaged in state action and to have infringed on the group's right to free speech.

It has long been recognized that any regulation of First Amendment rights must be content-neutral and narrowly tailored to serve a significant governmental purpose or interest. *Cf. Perry Education Assn. v. Perry Local Educators Assn.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Here the restrictions placed by DFI are neither content-neutral nor narrowly tailored. Participation was denied to anyone whom DFI thought to be inappropriate.

There are innumerable cases relating to the limitation of the state or anyone acting on its behalf to restrict free expression. The cases cover almost every possible human activity. A brief sampling include the following:

> Government has no power to restrict expression because of its message, its ideas, its subject matter or its content ...

*Police Department of the City of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

> When the regulation is based on the content of speech, governmental action must be scrutinized more carefully to ensure that communication has not been prohibited merely because public officials disapprove of the speaker's view.

*Consolidated Edison Company v. Public Service Commission*, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980), quoting *Niemotko v. Maryland*, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951).

We have consistently rejected the suggestion that a government may justify a content based prohibition by showing that speakers have alternate means of expression.

*Consolidated Edison, supra.*

To preserve civility is one thing; to insist that all dialogue proceed on a model of an ordered meeting should be quite another.

*Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284, *Reh. Denied* 404 U.S. 876, 92 S.Ct. 26, 30 L.Ed.2d 124 (1971).

Legal writers have also expressed their views on this subject as follows: The autonomy of the individual· and of the press from government's content based restriction is thus nearly absolute. Lawrence H. Tribe. *American Constitutional Law* § 12–8 at page 836, Second Edition, 1988, and the constitutional guarantee of free speech should not be avoided by government action which seeks to attain that unconstitutional objective under some other guise. *Tribe, supra.*

In a separate concurring opinion, Justice William O. Douglas of the United States Supreme Court in *Mulkey, supra,* stated in regard to an anti-discrimination statute involving real property that a provision that is a form of sophisticated discrimination in which the people harness the energy of private groups to do indirectly what the state cannot do should be condemned.

*North Shore Right to Life Committee v. Manhasset American Legion,* 452 F.Supp. 834 (E.D.N.Y.1978), is similar to this case. There, members of the right to life group sought permission to march in a Memorial Day parade sponsored by the American Legion to be held on the public streets. The group was denied a permit. The Federal district court held that the First and Fourteenth Amendment require that a parade permit be issued.

Although DFI disputes the validity of *North Shore, supra,* it was followed in *Gay Veterans Association, Inc. v. American Legion,* 621 F.Supp. 1510 (S.D.N.Y.1985); *Rubino v. City of Mt. Vernon,* 563 F.Supp. 907 (S.D.N.Y.1982); and *Abel v. Town of Orangetown,* 759 F.Supp. 161 (S.D.N.Y.1991).

An excellent discussion of this entire question can be found in *Irish Subcommittee v. Rhode Island Heritage Commission,* 646 F.Supp. 347 (D.R.I.1986). In that case the Rhode Island Heritage Commission sponsored and funded a festival on city property with booths and tables for various ethnic groups. An organization interested in assisting Northern Irish people had participated two times in the past without incident. In 1985 the Rhode Island Heritage Commission refused further participation because they determined that the group was too political. The Federal district court issued a summary judgment in favor of Irish Northern Aid and allowed them to participate in the event with a booth. The district court held that political speech was entitled to First Amendment protection; that the function was on public property and that the booth was no less a public forum than the lawn beneath it to which access could not be restricted; and that the Rhode Island Commission's regulation was a content-based restriction of speech lacking compelling justification.

The district court went on to note that public inconvenience, annoyance and even unrest can never justify curtailment of speech in a public forum. Here, although DFI argues that the CARTL presence was disruptive there is no evidence in the record of any such disruption, let alone a compelling justification.

The *Irish Subcommittee* noted in pertinent part:

Government officials may not restrict access to a public forum merely because they disagree with the views to be expressed there ... There is always a great danger that the standards for official approval will serve only as a mask behind which the government hides as it excludes speakers from the public forum solely because of what they intend to say.

646 F.Supp. at 357.

DFI's argument is that their interest in the fun and entertainment theme is sufficient justification for its exclusionary policy. A similar contention was previously rejected in *Toward a Gayer Bicentennial Committee v. Rhode Island Bicentennial Foundation,* 417 F.Supp. 632 (D.R.I.1976). In that case the

Rhode Island Foundation denied use of state property to the Gayer Committee during bicentennial events. The Rhode Island Commission's standard was based on programs that were "tasteful, appropriate and suitable." The Gayer Committee did not pass these tests but the U.S. District Court allowed them to participate fully in the event.

I would sharply differ with any implication that might be taken from the majority opinion that there is no difference between the federal and state constitutions. I believe that such an implication would be incorrect.

This case was entirely decided on the application of Federal law. However, it would appear that the decision of the trial court was erroneous because the conduct of DFI clearly violates the Kentucky Constitution.

Section 1 of the Bill of Rights guarantees to all people of Kentucky "The right of freely communicating their thoughts and opinions." Section 8 provides "Every person may freely and fully speak, write and print on any subject, being responsible for the abuse of that liberty." If the Kentucky Constitution had been invoked, it would appear that there is an even greater protection for the right of free speech than that provided in the United States Constitution.

Although it may be totally unintentional, DFI is clearly open to a charge of prejudice by relying on the vague standard they have adopted. This policy would seemingly permit DFI to exclude anyone from the use of public property if deemed inappropriate or if thought too controversial. Clearly this has an incredibly chilling effect on the First Amendment and other freedoms that should not be tolerated, particularly where public money, public purpose, public property and public attendance are significant factors.

Moving to a purely procedural and legal approach, it was error for the trial judge to grant summary judgment to DFI and fail to grant a temporary injunction to CARTL. Under the principles established by the U.S. Supreme Court, DFI engaged in state action and as a result, CARTL's constitutional right to free speech was infringed. DFI was a state actor whose broad and vague regulations were not content-neutral but were con-

tent-based and the application of the DFI policy violated the First Amendment to the Federal Constitution.

There were significant questions of fact that were not resolved in the summary judgment proceedings pursuant to *Steelvest v. Scansteel Service*, Ky., 807 S.W.2d 476 (1991). A movant should not succeed unless the right to judgment is shown with such clarity that there is no room for controversy.

In any event CARTL was entitled to injunctive relief under *Maupin v. Stansbury*, Ky.App., 575 S.W.2d 695 (1978) because there was irreparable injury in the loss of First Amendment rights even for a minimal period of time. *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The failure to obtain preliminary relief through injunction resulted in the complete and permanent denial of CARTL's opportunity to participate in the festival. Clearly, such injury is irreparable. The issuance of a temporary injunction was absolutely necessary to maintain CARTL's right pending a full decision on the merits and a substantial claim to a personal right of free speech was alleged. *Cf. Commonwealth ex rel. Cowan v. Wilkinson*, Ky., 828 S.W.2d 610 (1992).

Here DFI clearly focuses on the content of the speech and as a result the State has engaged in a prior restraint. It doesn't matter that everyone is excluded. It only matters that anyone is excluded. The decision of DFI is not content-neutral, it is content intensive. The decision was entirely based on content.

I would reverse the decision of the Court of Appeals and the trial court.

LAMBERT, J., joins this dissent.